**In re COPPER KING INN, INC., Debtor.**

**TRUST CORPORATION OF MONTANA, Plaintiff–Appellant,**

v.

**Robert PATTERSON, John Noonan, James McDermand, Donald Johnson, and Arthur West, Defendants–Appellees.**

**No. 89–35433.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 1990.

Decided Nov. 7, 1990.

---

Dale E. Reagor, Luxan & Murfitt, Helena, Mont., Norman L. Newhall, III, Alexander, Baucus & Linnell, Great Falls, Mont., for plaintiff-appellant.

David A. Hopkins, Marra, Wenz, Johnson & Hopkins, Great Falls, Mont., for defendants-appellees.

Before WRIGHT, BEEZER and TROTT, Circuit Judges.

TROTT, Circuit Judge:

We are asked to decide whether Trust Corporation of Montana ("Trust Corporation") has a perfected security interest in furniture and equipment owned by Copper King Inn, Inc. ("Copper King"), a Montana corporation currently in Chapter 11 bankruptcy. We agree with the bankruptcy court that it does not.

Copper King owned and operated a hotel in Butte, Montana. In 1984 it began to have trouble paying its debts. John T. Noonan and Robert C. Patterson, who were officers, directors and shareholders of Copper King, came to the corporation's rescue, extending loans of $62,500 each in exchange for interest bearing promissory notes. No security was given at the time. Copper King was unable to pay when the notes became due on December 31, 1984, so repayment was deferred until July 31, 1985. When the deadline arrived, Copper King was still in financial straits, and therefore repayment was postponed indefinitely.

Northwest Capital Management & Trust Company ("Northwest") entered the picture at this point. Northwest was predecessor in interest to the Trust Corporation, appellant in this case.[1] It also served as trustee for John T. Noonan Pension & Profit Sharing Plans. On February 1, 1986, Noonan directed Northwest to loan Copper King $100,000. Copper King gave Northwest a one year interest bearing promissory note in return.[2] In addition, Noonan and Patterson had Copper King sign a security agreement in which it pledged its furniture and equipment to secure both the recent $100,000 loan from Northwest and the earlier $62,500 loans.[3] The agreement erroneously listed Noonan as the creditor of the $100,000 loan. However it also referred to the promissory note Copper King had executed in favor of Northwest, a copy of which was attached.

During the same period, a financing statement was filed with Montana's Secretary of State. The statement listed Patterson and Noonan as secured creditors of Copper King in the total amount of $225,000, and described the items secured. The statement made no mention of Northwest.

On January 15, 1987, Copper King filed a petition under Chapter 11 of the Bankruptcy Code. Copper King's second amended plan for reorganization listed Noonan, Patterson, and (by this time) Trust Corporation as secured creditors in the amount of $225,000. James McDermand, Donald Johnson and Arthur West, dissenting shareholders in Copper King and appellees in this case, filed an objection to the plan on February 12, 1988, challenging the secured status of the three creditors. The bankruptcy court set a hearing for March 9, 1988 to consider these and other objections.

At the hearing, counsel debated the validity of the secured claims. The bankruptcy court instructed them to submit briefs and on June 22, 1988 issued an order in favor of appellees. The order recognized the $100,000 loan from Northwest constituted a security agreement, but held it was

---

1. Northwest and Trust Corporation will be considered the same entity for purposes of this appeal.

2. The promissory note was signed by Patterson and another representative of Copper King.

3. Noonan, Patterson and a third person signed the agreement on behalf of Copper King.

not perfected because the financing statement filed with the Secretary of State had not listed Northwest as a creditor. As successor in interest to Northwest, Trust Corporation inherited nothing.

The district court affirmed the decision on May 23, 1989. Trust Corporation timely appeals.

## JURISDICTION

We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291 (1988).

## STANDARD OF REVIEW

We review questions of law de novo, but uphold the bankruptcy court's findings of fact unless they are clearly erroneous. *In re Rubin,* 875 F.2d 755, 758 (9th Cir.1989).

## ANALYSIS

### I.

### *The Validity of the Hearing*

Trust Corporation contends as an initial matter that it was entitled to an adversary proceeding to determine the validity of its security interest. The bankruptcy court hearing, it says, did not qualify as such. Rather, the hearing had been set for the limited purpose of considering the merits of Copper King's second amended plan for reorganization. It was thus an inadequate forum in which to consider the more complicated issues surrounding its lien on the Copper King property. In any event, appellant argues, its attorneys were not afforded sufficient notice that the topic would be broached and were unprepared to debate it.

Appellees objected to Trust Corporation's claim pursuant to 11 U.S.C. § 502(a) (1988). Bankruptcy Rule 3007 provides:

An objection to the allowance of a claim shall be in writing and filed with the court. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession and the trustee at least 30 days prior to the hearing. *If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding.*

Bankr. Rule 3007 (emphasis supplied). Thus an adversary proceeding is required when the objector demands relief "of the kind specified in Rule 7001." *Id.*

Rule 7001, in turn, lists ten kinds of relief, including relief in the form of "a proceeding ... (2) to determine the validity, priority, or extent of a lien or other interest in property...." Bankr. Rule 7001. By contesting the secured status of Trust Corporation's claim, appellees challenged an aspect of its lien on the Copper King property. Their objection therefore normally would have triggered the requirement of an adversary proceeding.[4] Rule 3007, in addition, provides that notice shall be given to the opposing side within thirty days of such hearing. Trust Corporation received twenty-five days notice in this case.

■ Because Trust Corporation did not object to the form of the proceeding until several weeks after it was held, it is in a poor position to complain that the bankruptcy court failed to label the hearing "adversarial" or invoke Rules 3007 and 7001. It is also on weak ground in complaining it received twenty-five days notice instead of thirty. The bankruptcy court noted these technical shortcomings in its order of June 22, 1988, but observed:

The Court notes that the proper procedure to resolve a claim for subordination is by the filing of an adversary proceeding pursuant to Bankruptcy Rule 7001. In this case, the objections were filed, then responses were filed, and then an evidentiary hearing was held after which briefs were submitted. Accordingly, the parties essentially followed the same pro-

---

**4.** *As one commentator has written:*

The validity of a lien may be determined in contexts other than adversary proceedings.... However, a lien may not be invalidated over the objection of the lienholder as part of a plan of reorganization. An adversary proceeding is necessary for such purpose.

9 *Collier on Bankruptcy* ¶ 7001.05, at 7001–12 to –13 (15th ed. 1990) (footnote omitted).

cedure afforded by an adversary proceeding.

We agree with the bankruptcy court that for all practical purposes an adversarial proceeding was held in this case. Moreover, Trust Corporation has not shown its position was materially prejudiced by the course of events. The difference between twenty-five and thirty days notice is trivial. The extensive hearing and subsequent briefing gave Trust Corporation ample time to air its position. Under these circumstances, Trust Corporation's failure to object at trial is fatal to its claim.[5]

## II.

### *Validity of the Secured Claim*

■ We next address whether Trust Corporation has a perfected security interest in Copper King's furniture and equipment.[6] State law controls the validity and effect of liens in the bankruptcy context. *In re Loretto Winery Ltd.*, 898 F.2d 715, 718 (9th Cir.1990); *In re Wind Power Systems, Inc.*, 841 F.2d 288, 293 (9th Cir.1988); *In re Southland Supply, Inc.*, 657 F.2d 1076, 1080 n. 6 (9th Cir.1981). Our analysis therefore is governed by Montana law.

Montana law provides that a "financing statement must be filed to perfect all security interests" except in certain circumstances. Mont.Code Ann. § 30–9–302 (1989). Furthermore,

[a] financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address and the county of residence of the debtor, and contains a statement indicating the types or describing the items of collateral.

Mont.Code Ann. § 30–9–402(1) (1989). The financing statement here satisfied all the above requirements save one: it did not list Northwest as a secured party. Robert C. Patterson and John T. Noonan were the only creditors so mentioned.

Trust Corporation concedes this omission, but claims it is not decisive. It correctly notes that the final subsection of section 30–9–402 states: "[a] financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." Mont.Code Ann. § 30–9–402(8) (1989). We are not persuaded, however, that the omission of a creditor's name is a minor error.

The structure of the code section is highly suggestive of this result. The first subsection of section 30–9–402 sets forth the information that should be contained in all financing statements. This includes the name and address of the debtor and creditors and a description of collateral. Mont. Code Ann. § 30–9–402(1) (1989). The remaining sub-sections cover specific filing procedures, format instructions and special exceptions. Mont.Code Ann. § 30–9–402(2)–(7) (1989). Failure to comply with one of these more technical rules might constitute a "minor error." A deviation in format, for instance, could be considered harmless if the essential terms of the security arrangement were disclosed, albeit in improper order. It is unlikely, however, that the Montana legislature intended to excuse the omission of basic data such as the names of the parties to the security agreement.[7]

---

5. Of course, if a party does object at a hearing, and Rules 3007 and 7001 apply, an "adversarial" hearing should without question be held.

6. Appellant maintains there was no underlying security agreement to begin with. The bankruptcy court's opinion reveals there is no merit to this contention whatsoever, so we decline to reopen the subject here.

7. The Montana courts have not addressed this question, however the State Supreme Court, in dicta, has stated that "[t]here is no requirement that a party actually see the financing statement in order to have actual knowledge of its contents. However, the party must know the names of the parties, their addresses, and a description of the collateral." *First Nat'l Bank of Glasgow v. First Sec. Bank of Montana*, 222 Mont. 118, 721 P.2d 1270, 1274 (1986) (citations omitted). Two district courts have examined this section of the Montana code, but their decisions are not on point. *United States v. Ballard*, 645 F.Supp. 788 (D.Mont.1986); *Western State Bank v. Grumman Credit Corp.*, 564 F.Supp. 9

As the bankruptcy court recognized, the omission of a creditor's name could be seriously misleading, especially in situations like the one presented here, where officers and shareholders in the debtor company are also its creditors. Potential lenders have a special interest in knowing the identity of such creditors because of the obvious possibility that the insider relationship may lead to collusive behavior that could disadvantage them. Though the financing statement in this case indicated the full amount of debt, it did not disclose the true source of the credit. Noonan's own name was listed, but his company, John T. Noonan Pension & Profit Sharing Plans, and its trustee, Northwest, were nowhere mentioned. The existence of these shadow entities would have been highly significant to anyone contemplating a loan to Copper King. In view of the commercial realities of this case, we find the financing statement was seriously misleading.[8]

Trust Corporation responds that inquiries could have been made to Noonan, who would have clarified any ambiguity. This argument carries little weight. There is no guarantee an inquirer would have received a correct answer in these circumstances, where the incentive to provide misinformation may often be great. More fundamentally, an interested party generally would have little reason to doubt the accuracy of the financing statement in the first place, and therefore little reason to inquire further than the face of the document. Thus, the fact that a listed party stands ready to explain truthfully the nature of the security arrangement, or divulge the existence of other secured creditors, makes little difference. A potential creditor should not have to ask. Potential creditors are entitled to assume that facially adequate financing statements are complete in all material respects.

The fact that no one was deceived in this case also is irrelevant; general U.C.C. principles require courts to measure the accuracy of financing statements from the standpoint of the hypothetical creditor. *Cf.*

*In re Pacific Trencher & Equipment, Inc.*, 735 F.2d 362, 364 (9th Cir.1984); *In re Thomas*, 466 F.2d 51, 53 (9th Cir.1972). Faced with the financing statement in this case, a hypothetical creditor could easily have been led astray.

Trust Corporation directs our attention to commercial cases outside of Montana. Since Montana code section 30–9–402 is nearly identical to Uniform Commercial Code section 9–402, cases analyzing that provision are relevant to our inquiry. Nevertheless, we find the precedents cited by Trust Corporation unhelpful.

Trust Corporation relies on *In re Wilco Forest Machinery, Inc.*, 491 F.2d 1041 (5th Cir.1974). In that case, the court upheld the validity of a financing statement although the company listed as secured creditor had merged into a separate corporation prior to the bankruptcy of the debtor and become a division within the new entity. The statement had not been amended to reflect the change, but it was deemed not seriously misleading because the creditor was still doing business under its original name, having altered only its corporate form and location. *Id.* at 1045. In the present case, by contrast, Northwest was completely omitted from the financing statement. Noonan's name was listed, but that could hardly have informed a potential creditor of the identity of Northwest, a company with an independent existence, related to Noonan only through a business relationship.

Trust Corporation next cites *In re Fried Furniture Corp.*, 293 F.Supp. 92 (E.D.N.Y. 1968), *aff'd*, 407 F.2d 360 (2d Cir.1969), where a bank and a small business administration both served as secured creditors, though only the bank was listed on the financing statement. The court found the omission insignificant when examined in light of the federal law encouraging joint lending between local banks and small business administrations. *Id.* at 93. No such statutory relationship exists in this case. *Fried Furniture* admittedly can be read for the broader proposition that so long as

(D.Mont.1982), *aff'd*, 701 F.2d 187 (9th Cir. 1983).

---

**8.** *See generally*, Anderson, *Uniform Commercial Code* § 9–402:18 (the requirement that the creditor's name be listed "will be dictated by the commercial realities of the situation ...").

a financing statement discloses the total debt, potential creditors have no interest in learning the identity of all the secured parties. *Id.* We reject this principle as unsound, at least in those cases involving insider relationships, where distinguishing between the various creditors becomes more important.

In a last ditch effort, Trust Corporation asserts Noonan was acting as an agent of Northwest when he signed his name on the financing statement. We are aware that, as a general matter, "an agent may appear as debtor or creditor or sign necessary papers on behalf of a principle." Anderson, *Uniform Commercial Code* § 9–402:9. However, no evidence supports Trust Corporation's contention that such a relationship existed in this case. Even if we were to accept Trust Corporation's ad hoc theory about how one might "characterize" Noonan as an agent, the more important point is that a potential creditor never would have guessed that Noonan occupied such a position. Indeed, certain evidence indicated the contrary since Noonan, acting purely as an individual, had loaned Copper King $62,500 of the $225,000 debt covered by the financing statement. A potential creditor stumbling across this information might naturally have assumed that Noonan was also the personal creditor of the $100,000 sum that in reality had been advanced by Northwest.

We are mindful that in analyzing the sufficiency of financing statements courts should guard against "the fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves." U.C.C. § 9–402, Comment 9; *In re Softalk Pub. Co., Inc.*, 856 F.2d 1328, 1330 (9th Cir. 1988). At the same time, we do not view omission of a creditor's name as a minor detail, especially in the special circumstances surrounding this case. The bankruptcy court's decision, and the district court's affirming order, are therefore

AFFIRMED.